Henry S. Capps and Margaret T. Capps v. Commissioner.
Capps v. Commissioner
Docket No. 90756.
United States Tax Court
T.C. Memo 1964-77; 1964 Tax Ct. Memo LEXIS 258; 23 T.C.M. (CCH) 482; T.C.M. (RIA) 64077; March 23, 1964
Daniel R. Dixon, 808 Capital Club Bldg., Raleigh, N.C., for the petitioner. Wallace E. Whitmore, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1958 and 1959 in the amounts of $913.67 and $810.06, respectively. The parties have each agreed to certain adjustments and the only issue now remaining for our *259 consideration is whether the petitioners are entitled to deduct $1,135 in 1958 and $1,041 in 1959, as away from home travel expenses, said amounts having been claimed as $260 for room rent and $875 for meals in 1958, and $291 for room rent and $750 for meals in 1959. Respondent does not dispute that the above amounts were reasonable but does contend that they are not traveling expenses within the meaning of section 162(a)(2) of the Internal Revenue Code of 1954, [1] thus narrowing the sole remaining issue before us. Findings of Fact Some of the facts are stipulated and are so found. Petitioners are husband and wife, who filed joint Federal income tax returns for 1958 and 1959, with the district director of internal revenue at Greensboro, North Carolina. The claimed deductions are all those of Henry S. Capps, who will hereinafter be referred to as petitioner. Petitioner has been employed by the Metropolitan Life Insurance Company, hereinafter referred to as the Company, since the mid-1930's, first as a so-called debit agent, selling and collecting for small life insurance *260 policies (usually $1,000 or less face value) and having weekly or monthly premiums. In 1949 he was transferred to the Raleigh, North Carolina, office as an assistant manager, and during the latter part of 1954 he was assigned to the Company's "ordinary" insurance sales division, with the title of Metropolitan Insurance Consultant (referred to hereinafter as M.I.C.) in which capacity his primary duties were to sell and service "ordinary" insurance policies which were usually in face amounts of $1,000 or more, and as to which the premiums were payable at longer intervals. In such capacity petitioner's compensation was derived entirely from commissions on the sale and renewal of such "ordinary" policies, plus small amounts of commission on sales of group insurance and accident and health insurance, and plus the sum of $10 each week for expenses. This employment and method of compensation has continued through the years in issue and was still continuing at the time of the trial herein. During the two years in issue, petitioner's compensation from the Company was as follows: 1958
1959
First year and renewal com-
missions Ord.
$8,170.47
$ 9,453.77
A&H
349.65
238.43
Group
125.65
106.50
Other (incl. $520 expense
allowance in 1958, $530 in
1959)
843.70
1,011.73
Total
$9,489.47
$10,810.43
*261 In 1949 petitioner purchased a lot in Raleigh, North Carolina, upon which he built a house in 1950, which was occupied thereafter as a home and personal residence by petitioner, his wife and their three children, until they moved to Fayetteville in September 1960. Petitioner has been authorized by the Company to sell insurance anywhere in the state of North Carolina ever since he became a M.I.C. in 1954, and from that time until March 1957, his principal activities and most of his sales were made in and around the Raleigh, North Carolina, area. In about January 1957, the United States Government stopped furnishing to servicemen (and paying the preminums upon) what is commonly known as National Service Life insurance for military personnel, and at the same time private insurance companies were permitted, under rather strict regulations, to solicit military business on military bases. Petitioner was apprised of this and with the Company's permission he began to solicit insurance business from military personnel in the environs of Fort Bragg in March 1957. These first solicitation activities by petitioner were conducted off of the military base proper, because the responsible *262 military officials had ruled that no more than two representatives of any given insurance company were permitted to solicit business on the reservation, and the Company then had two persons, not including petitioner, so designated. Petitioner's activities off the base, but in its immediate environs, met with considerable success, and on or shortly before August 21, 1957, the Company changed its designations of authorized representatives on the Fort Bragg base to include petitioner, and he continued to hold such authorization through the years in issue. Fort Bragg is located in the Company's Raleigh, North Carolina district, and is about 50 miles south and a little west of that city. It is about 10 miles from Fayetteville, North Carolina, the nearest sizable town. Commencing in 1957 through the years in issue and until September 1960, when petitioner moved his family home from Raleigh to Fayetteville, petitioner habitually checked in at the Company's Raleigh office on Monday morning, spent about half the day there and then drove to the Fort Bragg area where he remained until Wednesday, Thursday, or occasionally Friday. He would then return to Raleigh in order to spend one night at *263 his personal residence, and again report in to the Company's Raleigh office the next morning, again spending about half the day there before returning to the Fort Bragg area to complete his usual week's work on Saturday afternoon. He would then return to his personal residence and family at Raleigh on Saturday night. During the years in issue, the Company required its M.I.C.'s in North Carolina, including petitioner, to report in at its Raleigh district office by 10 a.m. each Monday morning, and by 10 a.m. on one other day in each week in order to turn in all premium collections and to perform other administrative functions, such as receiving their remuneration, filing reports and writing letters. Secretarial services were available to M.I.C.'s and to petitioner at such times. The Company maintained a suboffice under the Raleigh district office at Fayetteville, during the years in issue, where petitioner could get at least some of his supplies, but secretarial service was not available to him there until sometime in 1959. When petitioner first started soliciting in the Fort Bragg area, he stayed at hotels or motels, but as the frequency of his trips increased and the pattern of *264 his work began to form, he engaged a room with another M.I.C. on a weekly basis in order to save expenses and to have a more permanent address where prospects and customers could contact him or leave word for him. He ate his meals in restaurants while soliciting in the Fort Bragg area, and during the years in issue, his expenses for room and meals amounted to $260 and $875 for 1958, and $291 and $750 for 1959, and it is the deductibility of these totals of $1,135 for 1958 and $1,041 for 1959, which are the sole remaining issues for our consideration in this case. The approximate face amounts of the policies sold by petitioner in 1957, 1958, and 1959, within a radius of approximately 10 miles of Fort Bragg; within a radius of approximately 10 miles of Raleigh and in other areas was as follows. 1957
Fort Bragg area - 42 policies - face
amount
$201,000
Raleigh area - 15 policies - fact amount
196,000
Other areas - None
Totals - 57 policies
$397,000
1958
Fort Bragg area - 81 policies - face
amount
$401,500
Raleigh area - 4 policies - face amount
20,000
Other areas - 2 policies - face amount
13,000
Totals - 87 policies
$434.500
1959
Fort Bragg area - 113 policies - face
amount
$584,000
Raleigh area - 3 policies - face amount
6,000
Other areas - 1 policy - face amount
5,000
Totals - 117 policies
$595,000
*265 The petitioner did not sell any policies, other than those shown immediately above, in 1957, 1958, and 1959, but during such years he did have some income from the Company from renewal commissions as to policies which he had sold prior to the year in question. Exact proof is lacking as to the amount of such renewal commission income or the place where the policies producing it had been sold, but petitioner estimated that for the year 1957 he derived approximately 45 percent of his total income from policies sold in the Fort Bragg area, and that such percentage increased to approximately 55 to 60 percent for the year 1958, and further increased to approximately 70 to 73 percent for the year 1959. There was no Company rule which required a M.I.C., or this petitioner, to live in any specified place. The only such rule was that M.I.C.'s, and this petitioner, were required to report in to the Raleigh office two mornings each week. Petitioner could have moved his personal residence to the Fort Bragg area in 1957, 1958 or 1959. He did not request such transfer in 1957 or 1958. He discussed the matter with Company representatives in 1959, and moved his personal residence and family to *266 Fayetteville, North Carolina, in September 1960. Petitioner's principal place of business during the years in issue was the Fort Bragg, North Carolina, area. Opinion The question of exactly what constitutes deductible "traveling expenses" within the meaning of section 162(a)(2) has perhaps been litigated as often as any single question in the income tax law field. The language of the section is simple: SEC. 162. TRADE OR BUSINESS. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * * The Supreme Court first considered this question in 1946 in Commissioner v. Flowers, 326 U.S. 465, and the facts of the instant case are so close to those involved in Flowers as to permit none of the distinctions drawn by some of the many cases decided since that time. The facts in Flowers are so well known that further exposition here would serve no useful purpose. The reasoning which *267 we consider to be of particular pertinence to to the case at bar follows: The portion of § 23(a)(1)(A) authorizing the deduction of "traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business" is one of the specific examples given by Congress in that section of "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." It is be contrasted with the provisions of § 24(a)(1) of the Internal Revenue Code, 26 U.S.C.A. Int. Rev. Code, § 24(a)(1), disallowing any deductions for "personal, living, or family expenses." * * *
The facts demonstrate clearly that the expenses were not incurred in the pursuit of the business of the taxpayer's employer, the railroad. Jackson was his regular home. Had his post of duty been in that city the cost of maintaining his home there and of commuting or driving to work concededly would be nondeductible living and personal expenses lacking the necessary direct relation to the prosecution of the business. The character of such expenses is unaltered by the circumstances that *268 the taxpayer's post of duty was in Mobile, thereby increasing the costs of transportation, food and lodging. Whether he maintained one abode or two, whether he traveled three blocks or three hundred miles to work, the nature of these expenditures remained the same. The added costs in issue, moreover, were as unnecessary and inappropriate to the development of the railroad's business as were his personal and living costs in Jackson. They were incurred solely as the result of the taxpayer's desire to maintain a home in Jackson while working in Mobile, a factor irrelevant to the maintenance and prosecution of the railroad's legal business. * * * Except for the federal court litigation, all of the taxpayer's work in Jackson would normally have been performed in the headquarters at Mobile. The fact that he traveled frequently between the two cities and incurred extra living expenses in Mobile, while doing much of his work in Jackson, was occasioned solely by his personal propensities. The railroad gained nothing from this arrangement except the personal satisfaction of the taxpayer. Travel expenses in pursuit of business within the meaning of § 23(a)(1)(A) could arise only when the *269 railroad's business forced the taxpayer to travel and to live temporarily at some place other than Mobile, thereby advancing the interests of the railroad. Business trips are to be identified in relation to business demonds and the traveler's business headquarters. The exigencies of business rather than the personal conveniences and necessities of the traveler must be the motivating factors. Such was not the case here. In arguing that Raleigh was in fact his principal place of business or post of duty, petitioner estimated that new and renewal commissions from policies sold in the Fort Bragg area, accounted for 45 percent of his total income in 1957, 55 to 60 percent in 1958, and 70 to 73 percent in 1959. The present record will permit no such findings, but in any event we consider the figures regarding the policies actually sold during those years to be more meaningful for the purposes of this case since they reflect petitioner's current activities during those respective years. In 1957 petitioner sold 42 out of a total of 57 policies in the Fort Bragg area, and for the years 1958 and 1959 (the years in issue) these figures were 81 out of 87 and 113 out of 117, respectively. These *270 figures speak for themselves. Respondent concedes that petitioner was required to perform certain functions at Raleigh, and at the trial herein offered to stipulate that Raleigh was petitioner's minor, or "ancillary or second" post of duty, and to allow petitioner a deduction of $250 for each year on this account. Petitioner refused this offer and respondent has renewed it on brief, suggesting that we estimate such deductible expenses under the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2). We feel that Rev. Rul. 55-604, 1955-2 C.B. 49 is applicable to the facts here and that the expense of such necessary functions performed at Raleigh are deductible. Consequently, employing the Cohan rule, we estimate that petitioner spent one-sixth of his business time at Raleigh during the years at issue and allow him deductions of $189 in 1958 and $174 in 1959. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise noted.↩